Please be seated. Your Honor, the second case on the docket this morning is the student batch, 15-1282, people of the state of Illinois, Clinton, Appaline, and Donald Chamberlain, men and women of color. The first woman on behalf of the Clinton family is Melissa J. Perkow. The second woman on behalf of the Clinton family is Kristen M. Truman. Ms. Perkow, will you proceed? Good morning, Your Honor. Good morning. May it please the Court, this morning I represent Donald Chamberlain who was convicted of perjury based on the limited authority doctrine. He entered into a Kohl's retail store and thereafter committed a theft. We do not on appeal challenge the retail theft conviction. We challenge only the burglary conviction claiming that he did not have the intent to commit theft at the time he entered the store. The issue of the limited authority doctrine was in front of the Supreme Court on a matter of statutory construction within the last few months, and that decision reaffirmed the applicability of the limited authority doctrine in retail theft cases. Despite that holding of the Johnson opinion, we submit that the language of the opinion is very instructive for the construct of the decision-making on this appeal. Important points that were made in the Johnson opinion had to do with the necessity that there be the intent, the mens rea, at the time of the entry into the alleged burgled premises. The Johnson opinion makes clear that not every retail theft is qualifying for a burglary conviction. There must be specific intent to steal at the time entry is made. The Johnson court refers to the entry as a discrete moment in time and stresses that the mens rea or burglary in premises open to the public is a matter that is difficult to prove. So we submit that you have to look at this case for facts that exist over and above the facts necessary to prove the retail theft. And specifically, you must look for those facts that pertain to the entry. Well, let me just ask one question before you identify your facts. It might be one of them, but as he's going someplace, maybe I thought it was in a squad car, I just was looking for a Christmas present or something to that effect in man. I was looking for a Christmas present, man. Does he ever identify who the Christmas present was for? No, because to my recollection of the record, there are at least two conversations. There's some conversation in the squad car, and then there's conversation again at the police station. There appear to be two conversations at the police station, so there are a couple of different conversations, and I believe at least two, both perhaps in the car and again at the police station, where Mr. Chamberlain indicates that he was going to the Coles to get Christmas presents. Now, if we look at some of the circumstantial evidence here, though, we have the fact that he did not have any money on him when he went into the store. Supposedly, if he wanted to buy a present, he didn't have any money to pay for it. Correct, and that is one of the two major facts on which the State predicates its argument or intent in this burglary. And, Ruth, we have responded to each of those items of proof. The one that you are addressing now has to do with the fact, well established and uncontested by us, that Mr. Chamberlain did not have money or a credit card or other means with which to pay on his own person at the time in question. However, his wife appeared as a witness at trial and testified that she had her debit card, that her bank account was funded, and that she was prepared and intending to pay for any purchases that her husband made. Well, but there was also evidence, was there not, that there had been a conversation with her husband while he was in jail in which he appeared to prompt her as to what to say, and she expressed certainly some confusion if one reads the conversation. Well, there's considerable dispute between the State and the defense regarding the construction of that conversation, and it's discussed both in the opening brief and in my reply brief and obviously the State's answer as well. So there's quite a bit of discussion regarding that conversation. What is extremely interesting about that jail conversation, and we would assert that it is absolutely exculpatory of Mr. Chamberlain, is that Mr. Chamberlain states to his wife in that conversation that it was Brandon who came up to me while I was in the coals and told me about the watches. So that is certainly very – that statement provides a very strong indication that intent to steal was not formed until after he met Brandon inside the coal store, which is obviously after the entry, which is the crucial question in this case. So that's the one – so that's one piece of evidence. Also regarding that conversation then, the State, for instance, says that it relies upon the tone of Mr. Chamberlain's wife in the conversation. We would submit that there would be no basis to interpret this woman's tone. I mean, her confusion is obvious, but her confusion seems to be, according to my listening of the tape, her confusion seems to be in response to the claim that Brandon, this individual third party, Brandon, had accompanied Mr. Chamberlain and his wife to the coals. And it is in that context that I understand that conversation that she said, Brandon, who what? We were alone, you know. So I mean, you have to listen to the conversation, and I think some inferences are possible, but the inference that she was confused or denying that she had the money, I don't think that that is a fair conclusion from that conversation. So that was the one – that is the one element of proof on which the State relies for intent. The other item of proof has to do with statements of Mr. Chamberlain and the testimony of one of the police officers that Mr. Chamberlain stated that he intended to steal items for the Christmas gifts. I certainly would hope that the court would look very carefully at the examination of the officer regarding this alleged statement by my client. Even if – I mean, maybe it was asked somewhere, maybe in someone's mind. Even if his wife has the money because she had just been paid that day, I believe, and the bank account was okay and it was the day before Christmas and they were getting gifts, is your wife going to buy her own gift if that's who this watch was for? I mean, why would you – you know, I was just trying to get a Christmas gift, man. Maybe he was getting it for her and he wasn't going to ask her for the money, although we now find out he had some other things, but the issue is the watch here. Well, I mean, I suppose that's a possible speculation, but with respect to the – To a reasonable inference? No. Okay. And that's why in the – well, into my argument in the opening brief, so towards the end of the argument, there's a considerable discussion about inferences and when inferences are possible. And there just are not enough basic facts in this case regarding the entry into the premises that will allow an inference to be drawn. And, I mean, the defendant's alleged statement is certainly a very important matter, but at its base that cannot meet the reasonable doubt standard where the officer who testified to this statement said that he couldn't remember the words that Mr. Chamberlain uttered for the statement. Well, I mean, this is simply not proof that would meet the reasonable doubt standard, and there is really a paucity of proof in this case that bears on mens rea, and it is basically these two items that we have now discussed, the statement of Mr. Chamberlain and the question of the wife's testimony and the ability to pay that was first addressed by Justice Zenon. Are we talking about Officer Fortino? Yes. Yes. So – Now, he was not in the store for very long before he was seen on the video camera, however, and in the meantime we found out afterwards he had taken other items, so I think you argue that the fact that he maybe wasn't seen immediately would mean that perhaps he didn't formulate the intent at the time he crossed the entry or didn't have the intent to steal when he entered the store, but there were other things that happened, weren't there? Well, Judge, the fact of the matter is that we don't know exactly how long he was in the store. We know that there's a period of five minutes or so from the time that the security officer, the toll security officer, viewed him on the video, noticed him on the video, and then followed him on various video shots and their time. So we know that there is at least a five-minute period between the time that the – approximately five minutes from the time the video first picked him up or the office, the store security man first noticed it and the time that Mr. Chamberlain left the store. But we don't really know how long he was there. I mean, he could have been there, like, say, for an hour or whatever, some very lengthy period of time, which would tend then to definitively overcome an inference of intent upon entry, you know, so we don't know that. And we cite the Banyan VA and ION case regarding this issue because the time question is a very important question that could supply very important evidence for either the state or the defendant, but that evidence is not in this case, despite the fact that Kohl's apparently had outside surveillance as well as inside surveillance. So we don't know why we don't know this, but we don't know how long he was in the store. Does multiple retail thefts indicate prior intent upon entry? Well, I think hypothetically you could have a situation where you show a modus operandi, for instance. So let's take that Johnson case from the Supreme Court, which is an example of a case where there was adequate proof of intent at entry. And in that case, they took backpacks, the defendant and an accomplice, and they left them in the vestibule of, I believe, a Walmart before they went inside and then they stole by stuffing merchandise into their clothing and then, upon leaving, disgorged it into the backpack. So if you had many cases like that or a number of cases like that where the same MO was used. What about walking into a store with a booster coat? Well, I mean, these will tend to, I mean, a booster coat? A booster coat is a coat that has false pockets. Well, yes. Remember the Andy Griffith show where the woman jingled? I'm sorry, but I don't. But I understand your point, and I mean, that would tend to be a classic case for showing intent. Was this the closest Coles to their residence? Something I do not know, Your Honor. There's a modus operandi where people from one county go to another county and they disperse from a common vehicle and go loot and then come back to the common vehicle and then go back to the county from whence they came, which would, I think, kind of imply that they intended to steal something when they came out here. Correct. And there are many, for instance, the cases that are cited in the Johnson opinion, you know, that indicate intent cases, cases where there was intent. Of course, there are cases like that, and they have to do with this type of coat that Justice McLaren is referring to. It has to do with the backpacks. It can have, there have been cases where there are multiple people involved in a coordination of activity. Certainly, that indicates intent, but we don't have any of that in this case. What we have is a very weak description of an alleged statement by the defendant admitting that he had an intent or arguably admitting that he had an intent and the question of not having any means to pay on his own person. But I submit that that's all we have. In the end, did Mrs., I guess Ms. Gillespie, did she actually purchase anything in that store? Not that we know of. Okay. Any questions? Thank you. Thank you. It was an opportunity to make the bubble. Thank you. Ms. Schwander, you may proceed. Carefully. If you pull the pin, it explodes. Break it. May it please the court, counsel, good morning. Opposing counsel said that not every retail theft is burglary, but as the court found here, in this case, it was both a retail theft and a burglary based on the evidence that was presented in the case. The court's ruling as to why he found the defendant guilty on the burglary charge begins in the record on page 255 and the court goes through a number of facts that it found supportive of the burglary conviction. Specifically, there was much talk about the defendant's admission to Officer Fortino that said, I came to the polls with the intent to steal a Christmas gift. He does say, I went to the polls to get a Christmas gift in the car, and then after he was Mirandized, he did admit that he entered the polls with the intent to commit a retail theft. And then the court cites a number of factors and facts that it gleaned from the evidence to support and corroborate the defendant's statement. He noted that he did not believe the defendant's actions on the videos showed that he was a shopper. Instead, he showed that he was moving from one place to another, attempting to hide behind his wife or behind some sort of display panel to take some merchandise. He leaves the packaging on the watch. The court also recognizes that the defendant, instead of leaving, walks around the parking lot, throws merchandise under the car. These are all factors that corroborate the defendant's confession here, which is, again, on appeal, this is an issue of reasonable doubt, which is in the light most favorable to the prosecution. Could the fact finder find essential elements of the offense? And here there are facts that support that. And the fact finder in this case, which was the court, his ruling was not unprobable or unreasonable that no fact finder could find what the court did. Throwing items under vehicles once you've left, how is that evidence of intent when you walked in? Isn't it as likely it could have been evidence of his now guilt that, oh, my gosh, I took these things? Just as easily as it could have been intent. It could be. You're exactly right, Your Honor. If it were that fact alone where he got rid of the proceeds from his theft, that could be a potential not of evidence of intent to steal when he entered. But when you look at that coupled with the other facts that were shown at trial, when you look at it in totality of the circumstances, that's when you see the defendant's intent was to enter the cold to commit an offense. Behind Ms. Gillespie or behind her back, does the video show that she was complicit in this particular activity? You know, the video alone does not show, the video has no sound. We're just looking at movements. It does look like there is some movements in tandem together, if you look as a reasonable inference. But, you know, more importantly, as the court found, when Ms. Gillespie testified, the court did not find her credible and reasoned that she goes in there, she goes into the cold, she does not buy anything. Her husband, I believe, I apologize, I can't remember if it's a husband or boyfriend, he leaves the store and for about five minutes she remains in the store without following him and leaving. They do not leave together. Then when she leaves the store, she sees that he's under arrest and she makes no movements to talk to him, does not address him, does not do anything towards the defendant, and she just leaves. And when you look at those facts coupled together with the defendant's movements, I think it's certainly a reasonable inference that she was somewhat complicit in the scheme here. Although, I would argue, since she was not charged, probably not enough to have been any sort of actual criminal charge. But, you know, there was discussion regarding Officer Fortino and his lack of remembering exactly the words that were used, by the defendant when he interviewed him after he was Mirandized. You know, those are issues of credibility for the court that heard the evidence and the weight it placed. And the court found that the officer was credible. And the court's finding of credibility is not unreasonable or improbable or, you know, unsatisfactory such that this court should be necessary to overturn. What's the standard on review? It's the Collins standard, which is we look in the light most favorable to the prosecution to determine if the fact finder found essential evidence. And it is a very high standard to meet. But, you know, as the court set forth in probably the three-and-a-half-page ruling, the court went through all of the facts that it relied on in finding the defendant guilty. The state did mention some of the facts, but the court really went into detail on a number of other facts that it also relied on in finding the defendant guilty. If there are no further questions, we would rely on our argument in the brief and ask this court to affirm the defendant's conviction. Ms. Coles wasn't in Newcastle, was she? I'm sorry, one more time. Ms. Coles wasn't in Newcastle, was she? I don't believe so, no. Thank you. We wouldn't have jurisdiction if it wasn't. Ms. Perko, you may proceed. Actually, I just have very brief comments. With reference to the findings and the length of the findings of the court, I would point out that those findings included at least two matters on which the court acquitted the defendant, one of them being assault to the officers or interference with the officers. But anyway, two charges of that nature. There's a drug charge involved in this case by reason of residue left in the straw. That's not contested on this appeal, but there were findings with reference to that. Of course, there are extensive findings on the retail theft. But just as a bottom line, I would submit to the court that you have to look at any fact in this record and ascertain whether that isolated fact actually bears at some level on the entry into the premises. And to talk about the wife being complicit, when I remember this one piece of testimony in the record, that the wife at a certain point took a picture of merchandise on her phone. And I couldn't even count the number of times that either I or my spouse or the man or my spouse had taken a picture of merchandise on our phone to send to something else. Certainly, I would number into probably tens of thousands of occasions that I have been inside a retail establishment and walked out without buying anything. So these are innocuous facts. And when you talk about the inference, and certainly we have no direct proof or, I mean, the kind of proof that we talked about in my opening argument here, you know, with reference to backpacks or clothing in which you can hide material or having, you know, a clear accomplice with you or a clear statement of guilt, we simply do not have those things in this case. The trial court's findings are very extensive regarding, you know, relatively extensive regarding retail backpacks, but we would submit not at all regarding burglary and the intent issue on burglary. And that's because those facts we submit are simply not in this record. What about getting rid of or, I mean, your examples are they brought backpacks and that's where they put things or, you know, when they left the building, he tossed things in different places. But he stole. Okay. They were presumably stolen merchandise. So you're saying that's only evidence of his, oh, my gosh, it's Christmas Eve, I can't believe I stole. Well, it's his evidence of getting rid of stolen goods or presumably stolen goods. I mean, really the record even on that is a little bit odd. And, you know, the court refused to find him guilty of theft over because it really is not clear where these materials from under the car came from. They're not clearly connected to my client. But, I mean, they have really, I cannot see what their relevance would be to the earlier point in time at the entry of the store. And, once again, I would stress that that is the, you know, and that's from the language of the People v. Johnson opinion from the Supreme Court. It is a discrete moment in time that the burglary occurs. And then you get into what inferences you can draw from these stats. And that's why I cite these cases, Sanchez and Casciaro, that have been decided by this court regarding the type of factual basis that you need to draw an inference. And here we are talking about, you know, the fundamental element of the appalling arrest. What is your response to Ms. Schwinn's comment about the woman going outside seeing the arrest and then doesn't make any contact, avoids contact, and add apparently the additional fact that they left the store at different times? How does that affect the argument that you're making, that this in some ways does not imply or infer that this was a spur-of-the-moment situation? Well, the fact that they were separated at some point when they were in the store, again, I wouldn't find it at all unusual if my spouse went to the men's department while I was in the women's department. That would not surprise me in the least. When the person suddenly is gone for too long a period of time or whatever, yes, you would come out to look for them. So then she goes outside, and I guess she doesn't do her presumed wifely duty of saving him. But I don't see that that gives an indication that she is complicit with him in criminal conduct. What about the idea that because he doesn't have any money and she's the only one that does, if he was intending to pay for it, wouldn't he have found her or stood by some point in the store where he would not be subject to liability for having possession of the watch with or without the accoutrements? Doesn't this fact that they left the store separately suggest that the idea that she has the means to pay when he supposedly left without her tends to be impeached? Well, we know that he formed, or at least we have conceded, that he formed an intent to steal. We don't deny that. We have conceded the retail theft conviction. So we know that he formed an intent to steal. The question is when he formed that intent. And we assert what we argued this morning, that there simply is not enough evidence in this case to show that he formed that intent by the time he entered the premises. And for that reason and all the other reasons we've given in our briefs this morning, we request that his conviction be confirmed for review first. Thank you. We have other cases on the call.